Bivens v. Select Portfolio Servicing, Inc. May it please the Court, Wayne Charles here on behalf of Mr. Bivens. This case is about information. My client has wanted to know if the servicer who says, I'm collecting the payments, actually represents the person who owns his note. He's been trying for the last seven years to get that information. He called me about four years ago and said, I can't get this information, and I said, of course you can. I stand here today incorrect, and I'd like this Court to change that. The – I mean, he wrote a letter asking who owns my note, and they answered, they gave him an answer. Yes, Your Honor, and he shouldn't have to take their word for that. He should be able to get some information. When there's documentary evidence available, he should be able to get something besides this is who owns your note. He should be able to get a document, and in this case, the document he's asking for is a very simple document. It's a certified copy of the note in its current condition. The note gets passed around from one lender. Whoever owns that loan gets the note, and it transfers from one to the other with a signature on it, an allotment or an endorsement. And what that note looks like now can show who owns it, and of course, a certified copy shows who actually has it. Is it your position that the statute requires the servicer to send a certified copy with all the attachments? Yes, Your Honor. The statute requires – it doesn't explicitly say so. I'll grant you that. Yeah. So you want us to add that to the language of the statute, add that requirement? No, Your Honor. The – yes and no. It asks – the statute requires that information be provided that is related to servicing, and the most related to servicing issue we have out here is are you actually the servicer? Do you have the right to collect these payments? So when my client asked for a copy of the note in its current condition, that's the only way – that's the primary way to find out if this institution actually represents the holder of the note. The judge on the other side pointed out, look, he already had a copy of his note. He knew what the terms and conditions were. Yes, he did, but that's not what he's asking for. He's not asking what the terms and conditions of the note were. He's asking, do you own the note? And he has a copy from over 10 years ago, but what does it look like now? Who has it now? Because what's undisputed here is that – well, what's unknown, Mortgage Lenders Network was the original lender and the original servicer. But your original deed to secure debt was made out to MERS. Was that not correct? Yes, Your Honor. And in your quiet title suit, you actually attached to that suit a copy of the transfer from MERS to Wells Fargo as trustee for SASCO as Exhibit F, did you not? Yes, Your Honor. So why didn't you already know who owned it? You have the transfer of the deed to secure debt together with the note and the obligation therein described. Because the first thing is that MERS is there purporting to transfer the note, but MERS never had the note. Wait a minute. MERS had the deed to secure debt. Exactly. They had the deed to secure debt, but they didn't have the note. Could not any lawyer tell him who owned the note from that record in the deed records of the Georgia County? You can't. You can't tell who owns the note from the security deed. The security deed gives them in Georgia the right to foreclose, but it doesn't actually give them the right to collect payments. Only the note gives them the right. What case is that? I don't have a case on that. Well, the transfer transferred not only the deed to secure debt, but it transferred the note. If they had the note, but Your Honor, and that's the reason that SPS is not relying on this and why the judge did not rely on this. In the district court, the judge did not hold the deed to secure debt shows that the note has been transferred. He didn't because nobody argued that to him. And SPS, you're right, Your Honor, and SPS here today is saying you have to assume that we're the servicer. Nowhere in a statement of undisputed material facts did it say the note was transferred here. When you read the note, the note says, sorry, when you read the original security deed, it says the MERS is the nominee for the lender on the security deed. But the lender still has the note. So because MERS never had the note, that's a mistake in that deed. It should never have said it transfers the note. In fact . . . I've been checking titles for 50 years. I guess I haven't done it for 40 years. But we always took that as a title lawyer because they didn't have MERS back then. But the transfers of a deed to secure debt have, from time immemorial, transferred the deed and the note. Until, as Your Honor knows, MERS came along. And then MERS split those two things. MERS got the security . . . was the assignee on the security . . . Okay. I'll talk to the other lawyer about that. And that is true. The district court did not rely upon that. But why don't you lose simply because you sent it to the wrong address? Because, Your Honor, the court is required to construe RESPA liberally in favor of the borrower. Here we have this plain language that says it has to be a separate and exclusive office and address. The plain language says if it's not an exclusive office and if it's not an exclusive address, it's not sufficient. Why doesn't exclusive there mean, as a matter of common sense, that that is the exclusive be able to prioritize all communications and correspondence received at that address and they know that those correspondence and only that correspondence will trigger these time frames. Exclusive does not mean that it has to be . . . that that office has to do nothing else. It means that that is the exclusive address with respect to the borrower and his mailings. Why is that not the obvious and plausible and not illiberal at all? Because it says may establish a separate and exclusive office and address. And that implies that it is a separate group of people working on this. So when it comes in, it comes in to people . . . So when the word separate always means that when a couple . . . so when a couple separate, that means they can't live with somebody else or ever be with somebody? Well, why can't this office also do something else? Because the law . . . because this is a regulation that modifies RESPA, the congressional statute. And we're talking about what the word separate means and what you're telling me that it means invariably and obviously that this office has to not only be separate with respect to the address that the borrowers will use, but it has to be separate in that it can't do anything else. Yes, Your Honor, and because it says separate and exclusive office and address. If it just said separate and exclusive address, I wouldn't be here arguing it. But it doesn't. It says separate and exclusive office and address. And the purpose behind that in the Roth case that's in there, it was a separate office in a separate city. The idea is there was actually a response that said from SPS that said, we got your letter and I'm transferring it to the right department. Under oath, their witness said, no, no. In fact, there was no transfer. The person who said he or she was transferring it was actually the same person who's going to continue to work on it. I want to . . . actually, Judge Pryor asked me to ask a question about exactly that. I mean, the express language of the statute, 12 United States Code, Section 2605E1A, talks about the responsibilities of the servicer once they, quote, receive the request. And there's no dispute that the servicer received the request here, right? That's right. They received it. And so they're not . . . SPS is prejudiced in no way whatsoever. The same people were there. The same people were working on it to look at this and say, well, this is something to protect the borrower. Well, wait a second. We're not trying to protect the borrower, to protect the servicer. The idea here is to interpret this to protect the borrower, the consumer. And the other thing . . . so there's two things here. One, separate and exclusive office and address. Again, Your Honor, Judge Anderson, you're exactly right. If it said separate and exclusive address, I wouldn't be making this argument. But when it says separate and exclusive office, it means we have people who are specialized in doing this. And they're the ones who handle it. If it comes into these other people, they're not so qualified to handle it. Otherwise, it's just . . . it really doesn't do anything more than provide an opportunity for them to say, wait. That wasn't the right . . . that wasn't the right address. So therefore, we get a pass on the law. I got you off on the address, and I think you lose on the other grounds, too. So, and just in a concise manner, it seems to me they gave you everything that you asked for. You asked basically for who owns it, and you asked for the note. They told you who owned it, and I guess they did not give you the note with the endorsements. So does not the note and the endorsements fall under the line of cases in the Ninth Circuit and, I think, the Fourth Circuit to the effect that the servicer is not required to give you the chain of title? In effect, the servicer is required to give you what the comparables section in the Truth in Lending Act says, to the best of my knowledge. I'm so glad you asked about the Ninth Circuit's opinion, which was seconded by the Fourth Circuit. The Ninth Circuit said . . . first of all, it's . . . I want to distinguish it. It says loan origination documents. We're not talking about loan origination documents here. We're talking about who owns it now. And number one, that's a very big distinction because we're not challenging the validity and origination of the loan. We're challenging who owns it now. Number two, because related to servicing, there's nothing more related to servicing than who owns it. And number three, of all the decisions on this topic that are cited here, none of them explain why a certified . . . a current copy of the note is not related to servicing. They just say it. This is the only one that says it. And it said it's not related to servicing because a servicer is unlikely to have it. Well, in this case, we have a fundamental difference. We know that the servicer does have it. They got it from the custodian. And because they have it, there's nobody else my client can get it from, I mean, I understand that. I guess what the Ninth Circuit was worried about was, you know, when a servicer comes into service alone after it's lived some life, then they might not know what preceded their role in servicing the loan. I mean, that's what the Ninth Circuit talks about. You know, a servicer is, quote, unlikely to have information regarding the loan's origination. And actually, we don't know that within these time limits that the servicer had the note. We know he had it later, but we do not know that within the time limits he had it. And frankly, he's not likely to have it. Well, that's exactly . . . that's exactly correct, Your Honor. However, what we do know is that they could get it. Simply for the asking, from the custodial bank. What we don't know is that my client can get this from the custodial bank. The way these are set up, you have a trust, you have a trustee, you have a custodial bank, and you have a servicer. And the only one of these three that will talk to the customer, the borrower, who's not the customer, the lender is the customer, the only one of these four organizations who will talk to the borrower is the servicer. So if the borrower can't get it from the servicer, he can't get it from anyone. He can't get it from the custodial bank. He can't get it from the trust, and he can't get it from the trustee. Only from the servicer. What I'm here to tell you today, they say he's trying to expand the definition of servicing. I am not. I am trying to use the definition related to servicing. And I'm here to tell you today that everything a servicer does is related to servicing. This is a very simple definition. Servicers don't manufacture cars. They don't make planes. They collect payments on loans. And there isn't anything that they do that isn't related to that because they don't make money for anything else. You know, now you've lapsed into argument. So I'm going to give you your full time for rebuttal and we'll hear from you then. Good morning. Good morning. May it please the Court. I'm Scott Hastings here on behalf of Select Portfolio Servicing. Your Honors, there are three independent fatal flaws in Mr. Bivens' RESPA claim. Mr. Bivens is trying to use RESPA to obtain information that is not required or covered by the statute. And I want to talk about those three reasons starting with first, the issue of servicing. The issue of the address where the qualified written request is supposed to be sent. Then talk about the definition of servicing, which is a statutory definition. And time permitting, also talk about damages. But let me start with the address. You don't deny that your client received Mr. Bivens' letter, do you? I mean, they got it, right? That's correct, Your Honor. My client received the letter and actually sent a response, which is one of the first things I wanted to say. Because I do appreciate your question. I understand Judge Pryor may have had this question too. The starting point is, and this is coming straight out of the Tenth Circuit's decision in Bernanke and the Second Circuit's decision in Roth. The failure to send a qualified written request, and I'm going to assume for the moment that we have one, just to make it easier to talk about. The failure to send the QWR to the proper address means that Section 2605 does not apply. That is the clear holding from the Tenth and the Second Circuits. And in both of those cases, you have a situation where it was undisputed that the servicer received the letter and even responded in part, which is our situation. But we're not bound by those cases. But I understand they're guidance. Yes. Your Honor, they are guidance. But I think they are important because they're also correct. You know, I had another question about the address while I've got you. So your designation of the address was a little vague. I mean, it could have said, use the language of the statute, this is where you send your qualified questions. You just said, you know, send inquiries, misspell inquiries to this address. So, I mean, does that weigh into our evaluation? No, Your Honor, and I respectfully disagree that the letter is vague. The letter says to send written requests. The word qualified wasn't used, but the word written request was used. And it references also disputes. So a fair reading of the letter, I think, put the borrower on notice that this is where to send their requests, their written requests. It's the plain English version for a borrower who may not be studying language of RESPA. But for what it's worth, the second page of the notice on the hello letter also talked about RESPA. So I think a fair reading of the letter put the borrower on notice. I would like to come back to why I believe the Second Circuit and the Tenth Circuit are right. That even when a borrower, or sorry, a servicer responds and receives a letter, that it's still important to have had it sent to the right address. RESPA is a statute that I think we all understand is designed for the servicer to provide information to a borrower. If the rule were otherwise, and a borrower sent a letter to the wrong address, the incentive that would have been created would be to ignore the letter. That's not what my client did. That's not what the lenders did in the Second or the Tenth Circuit. They tried to respond and treat it like general correspondence with a borrower. And by voluntarily providing information, they should not be held to have opened themselves up to RESPA liability. A contrary rule would be undermining the statutory purposes. And so, Your Honor, we believe that we have a clear letter here that the borrower knew, was told who the servicer was. Bank of America was the prior servicer. They told the borrower SBS is going to be taking over the servicing. SBS also sent a notice saying they were taking over the servicing. That's the hello letter with the address. There's no confusion. In fact, the borrower, 10 days after receiving the notice, filed a lawsuit against my client. That was the first lawsuit. There's no confusion about who the servicer was. And my client tried to respond. So, you're off of the address now? I was starting to move into the next point, Your Honor. What about his statement, his argument, that it doesn't say exclusive and separate address, only it says exclusive and separate address and office? How do you respond to that? And, Your Honor, I think the fair reading and reading into Your Honor's questions to my friend, I think the fair reading of that is what Your Honor had suggested, which is it's to provide a separate address. If we had a situation where that provision turned on what someone's job duties were in the particular office and whether they only handled QWR responses or they handled other things, would create an unworkable standard for these reasons. First, how would a borrower know when it receives a letter that said, here's the address to send your written requests? How would the borrower know if it may actually be somewhere else depending on what someone's job duties were? Second, how does a servicer know? If it believed it provided the notice, like we thought we did here, to a borrower, here's where you send your request. If we're going to be subject to after-the-fact litigation over people's job duties and titles just to figure out whether the notice counted, how are we supposed to know when we have to respond or how to respond? Well, in this case, was your client prejudiced by the fact that Mr. Vivens didn't send it to the right address? Your Honor, the way I can respond to that question is we are not arguing that we were prejudiced. I factually from this record cannot answer that question completely, but that is not an argument we have raised. So there's no evidence of any prejudice? We have not claimed prejudice. In fact, what we have claimed is that we went beyond what the law required and even though it wasn't compliant with the statute and even though, as we're, I hope, about to talk about, even though it went beyond what RESPA required us to respond, we actually did provide some of the information requested. Does RESPA require a servicer to show prejudice in order to rely on 3500.21? No, Your Honor, and I think reading a prejudice requirement would be undermining the regulation that has been set up and it would be in conflict with the Second and the Tenth Circuits where the servicer responded, but nonetheless, the courts agreed that Section 2605 had not been triggered. I thought the best answer to his suggestion that exclusive and separate address and office was that exclusive and separate for any common sense reading of the words had to mean exclusive and separate with respect to the borrower and the person sending the message, not necessarily separate from the standpoint of the company. In other words, it'd make no sense for Congress to require a separate office. And, Your Honor, I think that is a fair reading. And as the district court said, it would be nonsensical to impose the requirements that Mr. Bivens wants because, again, we would have to set up an entire department, have people that follow. And you can read the words very easily to make common sense or you could read them contrary to common sense as would the plaintiff. And, Your Honor, I think the common sense reading is certainly the better one. And perhaps because of discussions like this very one, the current regulation is written better. It doesn't have the exact same language. And as the CFPB has come in, it discusses it in terms of an address, perhaps because of this very discussion and recognizing that the prior language leads to some confusion, but the intent was clear. Your Honors, I would like to move on to the definition of servicing, which I think is important because even if the request had been sent to the correct address, what Mr. Bivens was seeking does not fall within the statutory definition of servicing. While my friend says everything a servicer does relates to servicing, that's not the statutory definition. I would add first... Well, in order to service a loan, you've got to know what the loan documents say, right? Your Honor, I would agree. But the definition of servicing of what is covered by RESPA is a defined definition. So what is required to service a loan and the statutory definition of servicing for purposes of this statute are not necessarily the same thing. I would like to point out, in addition to the Ninth and the Fourth Circuits, which have already been mentioned, I believe it's since the briefing has been closed or at least very recent this year, the Seventh Circuit has now also weighed in on servicing. This is a case called Perron, P-E-R-R-O-N. The quote from the Seventh Circuit says, so a qualified written request can't be used to collect information about or allege an error in the underlying mortgage loan. It's just another circuit court showing what RESPA is about and the requests are about are the application of the payments. That's what the statute says. Read that again. So a QUR can't be used to do what? Can't be used to correct, I'm sorry, to collect information about or allege an error in the underlying mortgage loan. Your Honor, the citation for that case is 845 F. 3rd 852, Seventh Circuit, it's January of 2017. Your Honor, what Mr. Bivens has been seeking here is information related to his loan. First, it is important to note that one of his requests for information was for the identity of the holder of the note, the owner, Wells Fargo. Mr. Bivens was told by the prior servicer, Bank of America, Wells Fargo, that's who is the trustee for the SASC Trust, they're the owner. In response, well within the RESPA time periods, my client also reiterated the exact same answer and that's also the answer that is reflected when you look at the transfer instruments that I believe Your Honors have asked my friend about. The transfer instruments are in the record. It's Supplemental Volume 3 at 133. Everyone was telling Mr. Bivens, it's Wells Fargo as the trustee, but he just wouldn't accept the answer. We can't make him accept the answer, but we certainly could provide the information, which we did. What he wants is the chain of title. And Your Honor, the chain of title that I think is relevant is also in the record. And Your Honor, absolutely was right. The security deed starts by designating MERS. Then we have the transfer in the record. Why didn't you argue that? Because this was not a proper RESPA case, Your Honor. This, you know, we're here on a legal challenge and ultimately the deficiencies in RESPA were more than enough, three different reasons why this case needed to be dismissed. And that argument is a fourth. I mean, ultimate, but that doesn't support . . . He says the reason you didn't argue it is because while he acknowledges that he knew or should have known that they exhibit F to his very quiet title suit filed before his letter, to the 1217 letter, he acknowledges that he knew that MERS had transferred the mortgage and the note to Wells Fargo as trustee for Sasko. But he says that MERS didn't have authority to transfer the note. It had authority to transfer only the mortgage. Is there any legal authority for that proposition? And, Your Honor, I truly appreciate that question because the answer is the Georgia Court of Appeals in Montgomery v. Bank of America, and this is really the quiet title case issue, not the RESPA response issue. But Montgomery v. Bank of America, it has been cited many times by this court in unpublished decisions. It holds that a borrower does not have standing to challenge these transfers. That's dispositive of this whole theory he's trying to investigate, although that's not exactly the RESPA issue today about what information needed to be provided and on what time frame. What's the cite to that, Montgomery? Do you know? Your Honor, I don't believe I have that case in front of me. We'll ask for it if we can. Montgomery v. Bank of America? Yes, Your Honor. About when was it decided? It was Georgia Court of Appeals. I believe it's in the 2000 some time frame. It's been cited many times. Okay. And the way I found it is literally ran a Westlaw search last night anticipating that very question. And if I ran standing, assignment, and I think borrower or servicer, and they popped up with many unpublished cases from this court. Judge Anderson's got good law clerks that can help him find it. Yes. I bet you he can find it on his own. Your Honor, as far as, so the information about who owns the note had been provided many times, which is obviously not to jump ahead, but that's obviously an important point on the damages issue as well. How could there be any damages for asking for something that he had before he sent the letter to us? And then we provide it in response. The other issue is the note itself. We believe, based on the cases we've cited, that RESPA did not require SPS to provide the note itself. What is in the record though is during the course of this litigation, we did obtain the note and provided it to come view when they came and took a corporate rep deposition. I believe it was in Utah. So they've seen it. Yet, we're still having to fight over these issues. There's no possible way there's damage. What's not in the record, there's no evidence that my client had the note until this litigation had already been going on for quite some time and got the note to try to appease Mr. Bitter. He suggests that it was just pounced upon him as a surprise when he got to Salt Lake City that there was this compromise. Is there anything to that? Your Honor, I don't believe that's right. I know it's not in the record developed from both sides about how everything came about. But what's undisputed is they had a chance to review the note. And Mr. Bivens, I think this is interesting, his deposition testimony is in volume four of the record, some excerpts. Mr. Bivens has never read his note. So even if it was a surprise, which I don't think it was, the lawyer had a chance to see it, had a chance to look at it, to see what's there. And we're dealing with a borrower who's already testified under oath that he never bothered to even read his note or read his security instrument as we're here. Your Honors, I know my time is up. So I'd just like to close briefly and say we're in a situation with Mr. Bivens who has never paid a payment on his mortgage since 2010, so nearly seven years. Complaining about the quality of information received in response to his letters. My client believes that RESPA did not cover his letters for the reasons we've said. But nevertheless, we still tried to provide him a response. It is unfortunate that this litigation has gone on as long as it has. But nevertheless, we are very pleased that the district court got the right answer and we're asking this court to affirm that judgment. Thank you. Thank you, Your Honors. I'd like to start first with the idea of what happened out in Salt Lake City. Salt Lake City, one of the documents that was requested to be at the Wells Fargo deposition was the note. And it wasn't. I got to see the note in an entirely separate building where Mr. Bivens' expert that he had hired, 29-year veteran of the Minnesota State Police Forensics Department, was not allowed to inspect that note. Now, the reason I wanted that note at the deposition was very simple. Because I'm going to put that note on the table in front of the witness and say, is this the accurate, authentic note? And under oath, that witness will have to say yes or no. But I didn't get that. I got it at a different building at 9 o'clock in the morning and then drove to a different place for a 10 o'clock deposition where the note wasn't there. And so no one under oath has ever said, this is the note. That's what I was looking for at that deposition. It didn't happen. I have to ask you, why not? The, you flew all the way to Salt Lake City when you already knew from the records in, what county are we talking about, Gwinnett County? Yes, Your Honor. You knew from the records in Gwinnett County, the chain of title of this note, with only the possibility that the note was not properly transferred by MERS according to some law you haven't cited me. And you spent enough money to go out to Salt Lake City to see the note? My client spent money. I spent money. Yes, Your Honor. And it's because I'm very serious about this. This is not a joke to me. This is not a joke to my client. And I understand it's not a joke to the court either. The case that SPS just cited, Montgomery v. Bank of America, does not say that the borrower doesn't have the ability to challenge the transfer of the note. It says he doesn't have the ability to challenge the transfer of the security deed. It's very distinct from the note. The note is not transferred at this same time. It used to be. They used to have the same thing. But this case is totally distinguishable. Now you went all the way out there to Salt Lake City. You must have some case law that told you that the note was not transferred in that Exhibit F. Tell me what that case law is. I don't have that case law, Your Honor. I asked in a separate QWR. My client asked, and in Mike Syphus' deposition, their witness, what does it mean? Does this mean the note was transferred? And their witness said, I don't know. He said, I don't know what this means when it says the note's transferred. In the qualified written request, I said, my client said, does this mean the note was transferred in this document? And we showed both. There's two assignments. Showed both those assignments. Does that mean this? And the answer we got was that happened when Bank of America was servicer. We don't know what it means. Well, Your Honor, if SPS can't tell what it means, how's my client supposed to tell what it means? And again, it's sort of a nonsense phrase to say, MERS transferred the note when MERS didn't have the note. And both their corporate witness in his deposition said, I don't know what that means. And SPS in their QWR said, I don't know what this means. Your Honor, when I keep getting, I don't know what this means, and we should assume standing instead of, Your Honor, how difficult is it to have a note write up a certification and say, here it is. This is the copy of the note today. It takes five minutes. It takes 50 cents in postage. We spent how many, a couple hundred thousand dollars here refusing to give a certified copy of the note. Again, with this, the client didn't read the note. The client's not talking about what's in the note. He's talking about who has the note. And the person who has the note has the right to collect. And that's related to servicing. If you don't have the right to collect, you don't have the right to service. RESPA doesn't talk about, QWRs are only about servicing. They are about related to servicing. Related is a very broad term. And this court, as Judge Martin wrote, RESPA is to be liberally construed for the borrower. The converse of that, if there's any vagueness, narrowly construed against the servicer. I want to talk about standing for just one second, if I can. SPS wrote, if the defendant has no liability, this court has jurisdiction to make that ruling as long as the plaintiff has standing. However, if this court, if SPS is not the servicer, then there's no standing to talk about the address. There's no standing to talk about whether the note is related to servicing. The first question this court has is, is there standing? Lujan says at the motion to dismiss stage, the burden is simply to allege standing. But at the motion for summary judgment stage, the plaintiff, the person with a burden of proving standing has to produce evidence of the standing. Instead, we get this assumption. We said, well, the judge said, well, Bank of America transferred it to SPS. Yes, but who transferred it to Bank of America? There's no evidence of that. The court said plaintiff insinuates that SPS is not the servicer. Well, my client doesn't insinuate that. I need you to wind up, you know, if you would. My client just wants to know. And that's why my client cares about the standing issue here, which would remand it back to the lower court for discovery because he wants to know, is SPS actually the servicer? Thank you. That concludes our session today. The court will reconvene tomorrow morning at 9 o'clock. Thank you.